825 So.2d 304 (2002)
Robert RIMMER, Appellant,
v.
STATE of FLORIDA, Appellee.
No. SC95318.
Supreme Court of Florida.
July 3, 2002.
Rehearing Denied August 26, 2002.
*308 Patrick C. Rastatter of Glass & Rastatter, P.A., Fort Lauderdale, FL, for Appellant.
Robert A. Butterworth, Attorney General, and Debra Rescigno, Assistant Attorney General, West Palm Beach, FL, for Appellee.
PER CURIAM.
Appellant Robert Rimmer challenges his judgment of conviction of first-degree murder and sentence of death. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons expressed below, we affirm appellant's convictions and sentence of death.

MATERIAL FACTS
Appellant and codefendant Kevin Parker were jointly tried and convicted of two counts of first-degree murder, armed robbery, armed kidnaping, attempted aimed robbery, and aggravated assault for the robbery and murders that occurred at the Audio Logic car stereo store in Wilton Manners, Florida. The facts in this case *309 reveal that on May 2, 1998, appellant Robert Rimmer and possibly two others, including co-felon Kevin Parker, robbed Audio Logic, during which Rimmer shot and killed two people.[1] The two employees, Bradley Krause and Aaron Knight, who were in the installation bay area of the store, were told to lie face down on the floor and their hands were duct-taped behind their backs. Two customers, Joe Moore and Louis Rosario, were also told to lie face down on the floor and their hands were then bound by duct tape. According to eyewitness Moore, appellant stopped him as he was leaving the store, showed him a gun tucked into the waistband of his pants, and ordered Moore to go back inside the store. Rosario, who was outside smoking a cigarette when the robbery began, also had been ordered to go inside the store, but he did not see the person who had told him to go inside. Personal items were taken from Knight, Krause, and Moore, including Moore's wallet and cellular telephone. During this episode, appellant was armed with a Vikale .380 caliber semiautomatic weapon.
While this was taking place, another victim, Kimberly Davis Burke ("Davis"),[2] was sitting in the waiting room of the store with her two-year-old daughter. While there, she had observed a purplish Ford Probe and a Kia Sephia drive up to the store. The Kia Sephia stopped in front of the store and co-felon Parker got out. He entered the store through the front door, looked inside a display case that was in the waiting room, spoke briefly with Davis and her daughter, and then exited through one of the doors that led to the bay area. Soon thereafter, Davis noticed appellant in the installation area. He then entered the waiting room and told Davis that her boy-friend Moore was looking for her. When Davis walked into the bay area of the store and observed the four men lying on the floor, she immediately understood what was happening and sat down, placing her daughter on her lap. Although appellant told Davis not to look, she observed appellant and two other individuals load stereo equipment into the Ford Probe, which was parked in the bay area.
At one point, appellant asked victim Knight for the keys to the cash register. He also asked if anyone owned a weapon. Knight told appellant that he had a gun, which he kept in a desk drawer in the store. Appellant retrieved the gun, a Walther PPK. Appellant also asked the two employees if there were any surveillance cameras, and if so, where the tapes were kept. The employees told appellant that the store did not have any surveillance cameras.
When the men finished loading the Ford Probe, appellant told Davis to move away because "he didn't want this to get on her." The victims heard appellant start to drive the car out of the bay area and then stop. Appellant returned to the bay area and said to Knight, "You know me." Knight responded that he did not. Appellant then said, "You do remember me" and walked up to Knight, placed the pistol to the back of his head and shot him. At the sound of the gunshot, Moore jumped to his feet. Appellant pointed the gun at him and told him to lie back down. Appellant then walked over to Krause and shot him in the back of the head. Appellant then thanked the three remaining victims for their cooperation and told them to have a nice day. According to the surviving victims, *310 the entire episode lasted fifteen to twenty minutes.
Knight died instantly. Krause, who was still alive when the police arrived, was taken to the hospital where he later died. According to the medical examiner, although Krause did not die instantly, he would have lost consciousness upon being shot. The police recovered a spent projectile fragment and shell casings from the scene of the crime, which were later identified as .380 caliber components. According to the State's firearm expert, the projectile fragment and shell casings came from the gun used by the assailant.
On May 4, 1998, Davis provided a sketch artist with a description of the shooter. The resulting sketch was given to Mike Dixon, the owner of the Audio Logic store, and several of his competitors. One competitor, John Ercolano, recognized appellant as the person depicted in the sketch and called Dixon. Apparently, Audio Logic had installed speakers in appellant's car in November of 1997. Appellant had returned in December of 1997 complaining that the speakers were not working properly. He had also taken his car to Ercolano's shop, complaining that Audio Logic had not installed the speakers correctly. Based on records kept by Audio Logic, the police learned appellant's identity, phone number, and address.
On May 8, Davis and Moore picked appellant out of a photographic lineup and later identified him from a live lineup as the person who shot the victims. Dixon identified appellant as the person who he had spoken to about installing equipment in his car.[3]
Appellant was arrested on May 10, 1998, after leading the police in a twelve-minute, high-speed car chase which ended at his residence. During the chase, appellant threw several items from his car, including Moore's wallet, the firearm used during the shooting,[4] and the Walther PPK stolen from the store. At the time of his arrest, appellant was driving a 1978 Oldsmobile. Shortly after his arrest, appellant's wife drove up in the Ford Probe. Both the Probe and the Oldsmobile were registered to appellant and both cars were impounded. During a subsequent court-ordered search of the Oldsmobile, the police discovered a day-planner organizer which contained a lease agreement for a storage facility. Appellant had rented the storage unit on May 7, just five days after the shooting incident. When the police searched the storage facility pursuant to a search warrant, they found the stolen stereo equipment. Both appellant's and Parker's fingerprints were on the equipment.[5] A surveillance tape, which was admitted in evidence, showed appellant renting the storage unit. Parker was arrested on June 12, 1998.
During appellant's case-in-chief, appellant's wife testified that on the day of the murders, appellant had intended to go fishing with his son. She further testified that she drove the Ford Probe that day, not appellant. The defense also called two experts who testified about appellant's visual impairment. Apparently, appellant wears corrective lenses. It was the defense's *311 theory that appellant could not have been the shooter because he wears glasses and the person who committed the murders was not wearing any glasses. The State presented rebuttal testimony from a Detective Kelley who also wears corrective lenses. Over defense counsel's objection, Detective Kelley testified about his ability to see without wearing glasses. At the close of all the evidence, the jury returned guilty verdicts on all counts charged in the indictment as to both defendants.
During the penalty phase, the trial court severed the proceedings so that each defendant could present mitigation evidence separately from the other. The court held Rimmer's penalty phase proceeding first. Parker's penalty phase proceeding commenced after the jury rendered an advisory sentence for Rimmer. During Rimmer's penalty phase proceeding, the State introduced facts surrounding Rimmer's conviction of prior felonies and victim impact evidence. The defense presented several witnesses, who testified about Rimmer's background, work, and family relationships. The defense also presented testimony from Dr. Martha Jacobson, a clinical psychologist who testified about appellant's mental illness. According to Dr. Jacobson, appellant suffers from a schizophrenic disorder.[6] However, she offered no opinion as to whether appellant's mental condition supported any statutory mitigators.
The jury recommended that appellant be sentenced to death for both murders by a vote of nine to three.[7] The trial court followed the jury's recommendation, finding six aggravating factors: (1) the murders were committed by a person convicted of a felony and under a sentence of imprisonment; (2) the defendant was previously convicted of another capital felony and a felony involving use or threat of violence to the person; (3) the murders were committed while the defendant was engaged in a robbery and kidnaping; (4) the murders were committed for the purpose of avoiding or preventing lawful arrest; (5) the murders were especially heinous, atrocious, or cruel (HAC); and (6) the murders were cold, calculated, and premeditated (CCP). The trial court only gave moderate weight to the HAC and murder in the course of a felony aggravators; the court gave great weight to the remaining four aggravators. The trial court found no statutory mitigators,[8] but found several nonstatutory mitigators: (1) Rimmer's family background (very little weight); (2) Rimmer is an excellent employee (some weight); (3) Rimmer has helped and ministered to others (minimal weight); (4) Rimmer is a kind, loving father (not much weight); and (5) Rimmer suffers from a schizoaffective disorder (little weight).
Appellant raises ten issues for this Court's review.[9]

*312 ANALYSIS

Motion to Suppress Physical Evidence
As his first issue on appeal, appellant argues that the trial court improperly admitted in evidence the organizer/day planner found in appellant's car, the lease agreement for a storage facility, in which the stolen electronic equipment was later found, and the stolen electronic equipment. Appellant contends that because the organizer was not listed in the search warrant for appellant's car, the organizer, and the evidence found as a result, should have been excluded as fruit of the poisonous tree because the seized items exceeded the bounds of the lawfully authorized search. The State on the other hand argues that the police seized the organizer during a valid search of appellant's car. The State maintains that the organizer was found in plain view and its incriminating nature was apparent on its face since it could reasonably have contained some of the smaller items identified in the warrant. Therefore, argues the State, the police were justified in searching through it. We find no error.
Subsequent to appellant's arrest, the police sought and obtained a search warrant for appellant's residence and his Ford Probe. A search of appellant's residence and the Ford Probe did not reveal any evidence of the crime. On May 12, 1998, the police obtained a search warrant for the Oldsmobile. The search warrant for the Oldsmobile sought: (1) fingerprints belonging to the suspect; (2) firearms used by the suspect; (3) shell casings or projectiles and ammunition used during the commission of the crime; (4) trace evidence of the crime; (5) blood or body fluids belonging to the victims or the suspect; (6) materials transferred from the scene of the crime by the suspect; (7) duct tape used during the crime; (8) personal property belonging to Knight, Krause, and Moore; (9) Moore's cellular phone; (10) Kicker and Solo-Baric brand stereo equipment; and (11) motor vehicle stereo sound equipment taken during the commission of the crime. By the time the police sought and obtained a search warrant for the Oldsmobile, they had already recovered Moore's driver license and wallet, a .380 caliber firearm and the Walther PPK firearm (the items thrown from the Oldsmobile during the car chase on May 10).
During the resulting search of the Olds-mobile, the police seized an organizer, a pair of shorts, a .380 caliber bullet, two holsters, and a pair of shoes. The police did not find any stereo equipment. Upon a search of the organizer, the police discovered a lease agreement for a storage facility that had been rented on May 7, 1998, just five days after the commission of the *313 crime. Using the lease agreement, the police obtained a search warrant for the storage unit where they discovered the bulk of the stereo equipment taken from the Audio Logic store during the robbery. A video surveillance tape, recovered at the time of the search of the storage unit, shows appellant renting the unit.
Appellant moved to suppress the stereo equipment on the grounds that it was the fruit of an illegal search and seizure. The trial court held a suppression hearing, during which the searching officer, Anthony Lewis, testified. According to Lewis, Detective Howard, from the Fort Lauderdale Police Department, who assisted in the search, found the organizer and turned it over to Lewis. Lewis testified that he believed that the organizer contained trace evidence of the crime. The trial court ruled that sufficient probable cause existed to search the Oldsmobile and that the search and seizure of the organizer fell within the ambit of the search warrant based on the number of smaller items listed in the warrant, including fingerprints, shell casings, blood and body fluids, and trace evidence. Accordingly, the trial court ruled that the items discovered in the storage unit were properly seized based on the information recovered from the organizer.
It is well established that the police may seize items in plain view without a warrant if the seizing officers are lawfully in a location where the item is observed and have probable cause to believe that the item is evidence of a crime. See Horton v. California, 496 U.S. 128, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990); Arizona v. Hicks, 480 U.S. 321, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987); Alford v. State, 307 So.2d 433 (Fla.1975). In Horton, the police searched the defendant's premises for proceeds of a burglary pursuant to a validly obtained search warrant. During the search, the police did not discover any proceeds of the crime, but found in plain view several weapons used during the commission of the offense. Although the affidavit had listed weapons, the resulting warrant did not include weapons within the list of items to be seized. Nevertheless, the trial court admitted the weapons at trial.
The United States Supreme Court affirmed, holding that a warrantless seizure of evidence found in plain view is admissible if at the time of the search: (1) the seizing officer was legitimately in a place where the object could be plainly viewed; (2) the incriminating nature of the seized object was immediately apparent to the police officer; and (3) the seizing officer had a lawful right of access to the object itself. See Horton, 496 U.S. at 136-37, 110 S.Ct. 2301. With regard to the third requirement, the Court explained that the seizing officer may lawfully seize an incriminating object if the officer has probable cause prior to the seizure and it was discovered within the parameters of a validly executed search warrant or one of the exceptions to the warrant. See id. at 138, 110 S.Ct. 2301; accord Jones v. State, 648 So.2d 669, 676 (Fla.1994). Indeed, "`seizure of property in plain view involves no invasion of privacy and is presumptively reasonable, assuming that there is probable cause to associate the property with criminal activity.'" Texas v. Brown, 460 U.S. 730, 741-42, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983) (quoting Payton v. New York, 445 U.S. 573, 587, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980)).
The First District Court of Appeal relied on Horton in holding that several items seized during a court-ordered search of the defendant's home, although not listed in the search warrant, were admissible because the items seized had been in plain view and the seizing officers had probable cause to believe that the objects were *314 fruits of the crime committed by the defendant. See Black v. State, 630 So.2d 609, 613 (Fla. 1st DCA 1993). The district court noted that the seizing officers need not know that the incriminating items are actually evidence of a crime; rather, what is important is that "the facts available to the [seizing] officer would `warrant a person of reasonable caution in the belief,' that certain items may be contraband or stolen property or useful as evidence of a crime." Id. at 614 (quoting Texas v. Brown, 460 U.S. at 741-42, 103 S.Ct. 1535).
Similarly, in Alford, this Court held that items seized during a lawful search of the defendant's residence were admissible despite the fact that the warrant did not list such items and the items were not the fruits or instrumentalities of the crime committed. In that case, the warrant permitted the search and seizure of .38 caliber shell casings. Upon a subsequent search of the defendant's residence, the police did not locate any shell casings, but instead discovered items of clothing which circumstantially led to the defendant's conviction. This Court held that the clothing was found in plain view because in searching for the .38 caliber cartridges, the police were justified in searching "closets, drawers, clothes piles, and any other conceivable nook and cranny in which [the cartridges] could be found." 307 So.2d at 439. This Court further noted that:
The State, in this case, should not be held to the strict requirement that only those things particularly described in the warrant may be seized. This would fly in the face of the universally accepted "plain view" exception to the warrant requirement of the Fourth Amendment. The police are not required to close their eyes and turn their heads away from evidence inadvertently discovered during the course of a lawful search, the presence of which they had no prior knowledge.
Id. (citing Coolidge v. New Hampshire, 403 U.S. 443, 465, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971)).[10]
Here, police obtained a search warrant to search appellant's 1978 Oldsmobile. Although the Oldsmobile was not used during the commission of the crime, appellant had been driving the Oldsmobile at the time of his arrest. Indeed, during the police pursuit, appellant had thrown several items from the car that either had been used during the crime or were items stolen during the robbery. Thus, the first prong of the rule announced in Horton is met because the search warrant provided the seizing officers with a legitimate right to search appellant's automobile.
Appellant argues that the second prong has not been satisfied because the organizer is not incriminating on its face. While the organizer itself may not be incriminating, the police had the authority to open the organizer to search for some of the smaller items listed in the warrant, including trace evidence, shell casings, blood or bodily fluid. See Alford, 307 So.2d at 439. Thus, the search of the organizer did not exceed the scope of the search warrant. Contrary to appellant's assertion, the lease agreement contained within the organizer is incriminating in that it further links appellant to the crime. At the time of his arrest, appellant was accused of stealing numerous boxes of stereo equipment, amounting to $12,000-$18,000 worth of equipment. A search of the Probe and appellant's residence did not yield the proceeds of the crime. Therefore, the police had probable cause to believe that a lease agreement entered *315 into on May 7, just five days after the commission of the crime, would be evidence of a crime because the storage unit mentioned in the lease agreement would likely contain the stolen items. Indeed, a subsequent court-ordered search of the storage unit revealed the bulk of the stolen equipment. Thus, both the second and third prongs of the Horton rule are met.
The cases appellant cites in support of his argument are inapposite. In Perez v. State, 521 So.2d 262 (Fla. 2d DCA 1988), the Second District held that the trial court erred in admitting evidence found during a search of the defendant's home where the seizing officers did not have probable cause to believe that the seized item was linked to a crime. In Purcell v. State, 325 So.2d 83 (Fla. 1st DCA 1976), the district court held that the trial court erred in admitting drugs found in a locked storage facility where the police had lawfully entered the facility to search for stolen photographic equipment. The court held that once the police located the stolen photographic equipment listed in the warrant, they did not have the authority to conduct a general search of the remainder of the premises. See id. at 86. Finally, in Sims v. State, 483 So.2d 81 (Fla. 1st DCA 1986), the First District held that the trial court had erred in admitting evidence seized from the defendant's residence where the warrant failed to describe the evidence to be seized with particularity. In that case, the warrant merely listed a blue wheelbarrow without providing any additional description to distinguish it from any other blue wheelbarrow.
Here, however, this Court is not faced with a warrant with an imprecise description of a sought-after object as in Sims, items seized without probable cause to believe that they were linked to a crime as in Perez, or a search exceeding the bounds of a valid search warrant as in Purcell. As noted above, the police obtained a warrant to search appellant's Oldsmobile, the organizer was discovered in plain view during the search of the car, and it was subsequently searched for some of the smaller items listed in the warrant. The lease agreement discovered inside the organizer is reasonably linked to the crime in this case because of the number of items taken and the fact that prior searches of the appellant's home and other automobile had not yet revealed the stolen items.
Accordingly, we find no error in the admission of the physical evidence discovered during the search of appellant's automobile.

Pretrial and In-Court Identifications
Next, appellant argues that the procedures used by the police during the photo spread and live lineup identifications were unnecessarily suggestive. His argument pertains to two witnesses: Joe Moore and Kimberly Davis. Moore observed appellant at the time of the robbery and described him as being five feet, ten inches in height and weighing approximately 160 pounds. However, appellant points out that he is six feet, two inches tall and, at the time of the offense, weighed almost 200 pounds. Moore also stated that the assailant wore a baseball cap pulled down over his eyes. On May 8, 1998, Moore was shown a photo array consisting of six photographs, one of which was a photograph of appellant. Moore selected appellant from the photopack. Several weeks later, on July 13, 1998, Moore was asked to view a physical lineup. Prior to the lineup, the police had told Moore that a suspect had been arrested and that his wallet had been recovered. At the lineup, Moore selected appellant. Appellant was the only person in the lineup whose photo had been in the photo spread viewed by Moore.
Kimberly Davis also observed the appellant at the time of the crime. She described *316 him as being roughly five feet, nine inches in height, weighing approximately 150 pounds. On May 4, she provided a description to a police sketch artist. The sketch was later used by the police to obtain the identity of appellant. On May 8, Davis viewed the photo-pack after Moore. She selected two photographs, no. 6depicting a person not involved in the crimeand no. 3appellant's photograph. However, Davis selected the unrelated person as her first choice and appellant as her second. The record indicates that at some point during this viewing, Detective Lewis told Davis that Moore had also selected photograph no. 3 and asked her why she had selected no. 3 as a second choice. Davis responded that after he told her that Moore had picked no. 3, she paid more attention to it. Both Davis and Lewis testified that he had told her about Moore's selection after she had made her two choices. On July 13, 1998, Davis viewed a live lineup and selected appellant.
During a subsequent suppression hearing, defense counsel argued that Davis's response indicates that Lewis told her about Moore's choice before she selected the second picture (i.e., the one depicting appellant). The trial court agreed that Lewis's comment was improper, but ruled that it did not taint Davis's identification. The court found that Davis had selected the two photographs because they looked alike, she had observed appellant on two separate occasions, and out of all of the witnesses, had the best opportunity to view the appellant. As to witness Moore, the trial court ruled that the identification procedures were not unduly suggestive.
The test for suppression of an out-of-court identification is two-fold: (1) whether the police used an unnecessarily suggestive procedure to obtain the out-of-court identification; and (2) if so, considering all the circumstances, whether the suggestive procedure gave rise to a substantial likelihood of irreparable misidentification. See Thomas v. State, 748 So.2d 970, 981 (Fla.1999); Green v. State, 641 So.2d 391, 394 (Fla.1994); Grant v. State, 390 So.2d 341, 343 (Fla.1980). The factors to be considered in evaluating the likelihood of misidentification include:
[T]he opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.
Grant, 390 So.2d at 343 (quoting Neil v. Biggers, 409 U.S. 188, 199-200, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972)). If the procedures used by the police in obtaining the out-of-court identification were not unnecessarily suggestive, however, the court need not consider the second part of the test. See Thomas, 748 So.2d at 981; Green, 641 So.2d at 394; Grant, 390 So.2d at 344.
Applying these rules in the instant case, it does not appear that the out-of-court identifications were unnecessarily suggestive.

A. Moore
Appellant challenges Moore's identification on the basis that (1) Moore identified appellant from a photo spread despite his earlier statements to the police that the gunman had a baseball cap pulled down over his eyes, (2) Moore's description of Rimmer did not match Rimmer's actual physical attributes, and (3) Moore was only able to glimpse the gunman during the robbery and murders. However, we do not find that these allegations render the photopack and live lineup identifications unnecessarily suggestive. At most, these allegations suggest that Moore did not have sufficient opportunity to observe the *317 perpetrator. But the ability to observe is a far cry from whether the police employed unnecessarily suggestive procedures to secure an identification. Moreover, any claim that the procedure was suggestive is diminished by the fact that Louis Rosario was not able to pick any persons from the photo spread or live lineup.
Appellant further contends that Moore later identified Rimmer from a live lineup only after the police told him that Rimmer had been arrested and had his (Moore's) wallet.[11] However, the fact that the police told Moore prior to his viewing the physical lineup that they had included a suspect in the lineup does not taint Moore's identification. In Green, the victim was shown a photo array consisting of six photographs, one of which was a picture of the defendant. The police then told the victim that they had included a picture of the suspect within the photo spread. After picking the photograph of the defendant, the police told her that she had identified the right person. 641 So.2d at 394. After applying the above-mentioned test, this Court held that the police procedure was not unnecessarily suggestive. We reasoned that the photo spread consisted of six men with similar characteristics. Although defendant Green's photo was darker than the others, there was no evidence that the police directed the victim's attention to it. Thus, we held that the trial court did not err in refusing to suppress the out-of-court identification. See id. at 395.
Appellant does not allege that the other persons in the lineup possessed characteristics different than the appellant, such that appellant would stand out. The fact that appellant was the only person in the physical lineup that had also been in the photo spread does not taint Moore's identification because the physical lineup took place on July 13, 1998, two months after the photo spread, and there is no evidence in the record that Moore reviewed the photo spread shortly before viewing the physical lineup. In fact, Moore testified at the suppression hearing that he did not speak to anyone who also had viewed the live lineup and that he made his selection based on the robbery incident and not the prior photo identification.

B. Davis
Appellant challenges Davis's identification on the grounds that she initially selected a person other than appellant from the photo spread and that she selected appellant's photo only after a police officer told her that Moore had also picked him. Appellant further contends that in the subsequent live lineup shown to Davis, Rimmer was the only person in the lineup whose photo had been displayed in the photo spread. Thus, argues appellant, Davis not surprisingly picked Rimmer from the lineup. We find no error with the admission of Davis's identifications.
While Detective Lewis's comment to Davis that Moore had picked the same person as she was improper, it does not appear to have rendered the entire procedure unduly suggestive. First, the record makes clear that Davis had already selected appellant from the photo spread when Detective Lewis made his comment. Second, there is no indication that the police caused Davis to select appellant. Indeed, she picked another photograph before selecting the appellant's. Davis testified *318 that she picked the two photographs because they both resembled the assailant.
Even if we were to find the procedure employed with regard to Davis was unnecessarily suggestive, it does not appear from the totality of the circumstances that the procedure created a substantial likelihood of misidentification, using the five factors mentioned above. See Neil, 409 U.S. at 199-200, 93 S.Ct. 375. First, of the three surviving witnesses, Davis had the best opportunity to view the assailant. She initially saw him in the waiting room of the store and later watched him and another load boxes of stereo equipment into appellant's car. Unlike the other victims, Davis had not been forced to lie face down on the floor. Davis later provided a description of the assailant to a police sketch artist, which helped the police obtain appellant's identity. Second, her degree of attention was greater than the other witnesses because, as mentioned above, she was not told to lie face down on the floor. Rather, she was able to observe the appellant for the entire episode, which last approximately twenty minutes. Third, Davis's description appears to be an accurate depiction of appellant, despite the fact that she described the assailant as being much shorter than appellant's actual height. As noted above, Davis provided the sketch artist with a description that permitted the police to obtain the identity of appellant. Appellant does not claim that the sketch does not resemble him. Fourth, Davis selected appellant from the photo spread as one of her choices. Thus, the fact that she also picked another photo does not affect her level of certainty because she claimed that the two photos looked alike. Finally, Davis viewed the photo spread just six days after the robbery. Thus, it appears that Davis's out-ofcourt identification was reliable.
Accordingly, we find no error with the trial court's refusal to suppress the out-of-court identifications of Moore and Davis.

Excusal of Prospective Jurors
In claim three, appellant contends that the trial court improperly excused two prospective jurors. Appellant argues that the trial court erred in excusing venireperson David Vandeventer based on his views in opposition to the death penalty. Appellant argues that the trial court also erred in excusing prospective juror Gwendolyn Sthilaire because the State failed to provide a sufficient race-neutral reason for its peremptory strike. We find no error with the trial court's ruling as to either juror.

A. Juror Vandeventer
Appellant argues that the trial court improperly excused juror Vandeventer for cause based on his anti-death penalty views. When asked if he could follow the court's instructions and recommend a sentence of death, Mr. Vandeventer stated that he "guessed" he could. Thus, appellant maintains that juror Vandeventer indicated his ability to follow the law and court's instruction and, therefore, he should not have been excused for cause. We disagree.
"The test for determining juror incompetency is whether the juror can lay aside any bias or prejudice and render a verdict solely on the evidence presented and the instructions on the law given by the court." Kearse v. State, 770 So.2d 1119, 1128 (Fla.2000) (citing Lusk v. State, 446 So.2d 1038, 1041 (Fla.1984)). Under this test, a trial court must excuse a juror for cause if any reasonable doubt exists as to whether the juror possesses an impartial state of mind. See id.; see also Singer v. State, 109 So.2d 7, 23-24 (Fla.1959) ("[I]f there is basis for any reasonable doubt as to any juror's possessing that state of mind which will enable him to render an impartial verdict based solely on the evidence *319 submitted and the law announced at the trial he should be excused for cause on motion of a party, or by the court on its own motion.").
Here, when juror Vandeventer was asked by the court if he could under any circumstances recommend a sentence of death, he responded that he could not. Later, Mr. Vandeventer was asked a series of questions about his views. In response to these questions, Mr. Vandeventer told the court that he previously favored the death penalty, but that he had recently changed his views for religious reasons. He also had recently experienced health problems which altered his view on the death penalty. When asked by counsel for Parker whether he would be able to follow the judge's instructions on the law in making a recommendation, Mr. Vandeventer responded, "I guess so. I'm kind of unclear about that." Parker's attorney did not attempt to clarify Vandeventer's response and did not ask him any further questions. Rimmer's attorney did not ask any questions. The prosecutor then asked Mr. Vandeventer that given his recent change in view due to his religious beliefs, is it true that he could not make a death recommendation in any case. Vandeventer responded, "I think so."
Following this discussion, the State moved to strike Vandeventer for cause. The court agreed and granted the challenge for cause. The court stated that it had "reasonable doubt as to whether or not Mr. Vandeventer can follow the law in the penalty phase." In so ruling, the court compared Vandeventer's responses to those of another juror who clearly and convincingly asserted that he could follow the law despite his personal views.
Based on the responses that Vandeventer gave upon being questioned about his personal views on the death penalty, we find no error with the trial court's decision to excuse him for cause.

B. Venireperson Sthilaire
Appellant argues that the trial court improperly granted the State's peremptory strike against Ms. Sthilaire because the "race-neutral" reason provided by the State was factually incorrect. During voir dire, the prosecutor asked Ms. Sthilaire for two or three things that she believed caused people to commit crimes. Ms. Sthilaire responded, "Mystery question. Really. I don't really, I can't answer you because I believe that it all depends on the individual. Different cases and different situations. I really couldn't answer." The prosecutor also asked her about her previous trial experience, in which she was a juror. Ms. Sthilaire stated that she was not able to reach a verdict in that case. Later, when asked about her views on the death penalty and whether she could recommend a sentence of death, Ms. Sthilaire answered that she could recommend a sentence of death.
The prosecutor subsequently moved to strike Ms. Sthilaire. Parker's attorney objected and asked for a race-neutral reason for the peremptory strike.[12] The prosecutor responded:
[F]irst one would be when I asked her with regards to the death penalty, she said that's the mystery question. She didn't have an answer. More importantly, number two, she sat on a case before, was a hung jury.
The court overruled the objection, finding both reasons to be race-neutral, made in good faith and not pretextual. Neither defense counsel objected to the reasons provided or notified the court that the *320 prosecutor had misquoted the juror. Once the twelve members of the jury were selected, neither defendant objected to the panel as selected.
This issue was not preserved for appellate review because appellant accepted the jury as selected and did not renew an objection concerning Ms. Sthilaire prior to the jury being sworn. See Franqui v. State, 699 So.2d 1332, 1334 (Fla.1997); Joiner v. State, 618 So.2d 174 (Fla.1993). It is reasonable to conclude that by not renewing the objection prior to the jury being sworn, appellant abandoned any prior objection he may have had and was satisfied with the selected jury. See Joiner, 618 So.2d at 176 ("[C]ounsel's action in accepting the jury led to a reasonable assumption that he had abandoned, for whatever reason, his earlier objection. It is reasonable to conclude that events occurring subsequent to his objection caused him to be satisfied with the jury about to be sworn.").
Appellant also failed to preserve this issue for review because he did not challenge the State's race-neutral reason for the strike. In Melbourne v. State, 679 So.2d 759 (Fla.1996), we explained the process for objecting to a peremptory strike on racial grounds as follows:
A party objecting to the other side's use of a peremptory challenge on racial grounds must: a) make a timely objection on that basis, b) show that the venireperson is a member of a distinct racial group, and c) request that the court ask the striking party its reason for the strike. If these initial requirements are met (step 1), the court must ask the proponent of the strike to explain the reason for the strike.
At this point, the burden of production shifts to the proponent of the strike to come forward with a race-neutral explanation (step 2). If the explanation is facially race-neutral and the court believes that, given all the circumstances surrounding the strike, the explanation is not a pretext, the strike will be sustained (step 3). The court's focus in step 3 is not on the reasonableness of the explanation but rather its genuineness. Throughout this process, the burden of persuasion never leaves the opponent of the strike to prove purposeful racial discrimination.
Id. at 764 (footnotes omitted) (emphasis added). This Court added that
reviewing courts should keep in mind two principles when enforcing the above guidelines. First, peremptories are presumed to be exercised in a nondiscriminatory manner. Second, the trial court's decision turns primarily on an assessment of credibility and will be affirmed on appeal unless clearly erroneous.
Id. at 764-65 (footnote omitted). We further noted that "[t]hroughout this process, the burden of persuasion never leaves the opponent of the strike to prove purposeful racial discrimination." Id. at 764.
In Floyd v. State, 569 So.2d 1225 (Fla. 1990), the defendant failed to challenge the State's asserted reason for the peremptory strike, which the trial court had accepted as supported in the record but later turned out to be not true. In rejecting the defendant's challenge on appeal, we stated:
It is the state's obligation to advance a facially race-neutral reason that is supported in the record. If the explanation is challenged by opposing counsel, the trial court must review the record to establish record support for the reason advanced. However, when the state asserts a fact as existing in the record, the trial court cannot be faulted for assuming it is so when defense counsel is silent and the assertion remains unchallenged. Once the state has proffered a facially *321 race-neutral reason, a defendant must place the court on notice that he or she contests the factual existence of the reason. Here, the error was easily correctable. Had defense counsel disputed the state's statement, the court would have been compelled to ascertain from the record if the state's assertion was true. Had the court determined that there was no factual basis for the challenge, the state's explanation no longer could have been considered a race-neutral explanation, and Juror Edmonds could not have been peremptorily excused. Because defense counsel failed to object to the prosecutor's explanation, the Neil issue was not properly preserved for review.
Id. at 1229-30; see also State v. Fox, 587 So.2d 464 (Fla.1991).
Likewise, here, the factual accuracy of the reason offered by the State could easily have been determined by reviewing the record. The trial court in this instance cannot be faulted for accepting the facial reason offered by the State, especially where the State's factual assertion went unchallenged by the defense. Accordingly, we conclude that appellant has failed to preserve this issue for appellate review.

Rebuttal Testimony
In claim four, appellant argues that the trial court erred in permitting the State to present rebuttal testimony from Detective Kelley as to his ability to see without his eyeglasses. This evidence was offered by the State to rebut the defense's evidence that appellant wore eyeglasses and that without them he would be considered legally blind. Appellant contends that the fact that Detective Kelley could see without his eyeglasses is not relevant to the degree to which appellant can see without his.
During the State's case-in-chief, the State attempted to elicit testimony from Detective Kelley that, although he wore corrective lenses for nearsightedness, he could drive without wearing his glasses. Detective Kelley has a vision impairment of 20/300. The trial court sustained the defense's objection but noted that the testimony might become relevant as rebuttal evidence if the defense presented evidence as to the extent Rimmer could see without his glasses. During the defense's case-inchief, the defense presented an optician and an optometrist to testify about appellant's vision impairment. According to the optometrist, appellant is nearsighted, with 20/400 vision capability and may be considered legally blind without corrective lenses. The defense's theory was that because appellant could not see without his glasses and because the shooter was not wearing glasses at the time of the offense, appellant could not have been the shooter. To rebut this defense, the State recalled Detective Kelley to the stand. Defense counsel objected on grounds that Kelley's ability to see without corrective lenses was not relevant to appellant's visual ability. The trial court ruled that Detective Kelley's visual ability was relevant to what a person with 20/300 vision could see and that the probative value of such evidence outweighed any prejudicial effect it may have on the jury. As a result, Detective Kelley was permitted to testify to the extent he could see without his glasses and to participate in a reenactment of the crime with the prosecutor.
We agree with appellant that the trial court clearly erred in permitting Detective Kelley to testify in rebuttal. Generally, rebuttal testimony is permitted to refute a defense theory or to impeach a defense witness. See Charles W. Ehrhardt, Florida Evidence § 612.5 (1999). While a trial court has the right to control the mode and order of the interrogation of witnesses and the presentation of evidence, *322 see § 90.612, Fla. Stat. (2000), and the decision as to whether to permit rebuttal testimony falls within the broad discretion of the trial court, see Pitts v. State, 473 So.2d 1370 (Fla. 1st DCA 1985), the testimony presented in this case was completely irrelevant to the matter at issue-namely, whether appellant could see and operate a vehicle without wearing his glasses.
As noted above, the defense presented two experts to support its theory that the appellant could not have been the shooter because of the fact that he must wear corrective lenses in order to see and the facts at trial indicated that the assailant was not wearing glasses at the time of the robbery and murders.[13] While the State certainly could have refuted this theory with its own expert as to what a person with appellant's vision impairment could or could not see, the State should not have been permitted to refute the defense's theory through lay testimony as to what that witness could or could not see. The fact that Detective Kelley can see certain things without his glasses does not mean that appellant has the same ability. Detective Kelley's ability to see, read, or drive without his glasses is not relevant to what appellant is capable of doing without his glasses. Accordingly, we conclude that the trial court erred in finding Detective Kelley's testimony relevant.
The State argues, however, and we agree, that even though we find the trial court's ruling to be erroneous, the error is harmless in light of the record in this case. Three surviving witnesses saw or heard appellant kill the victims. Two of them identified Rimmer as the shooter. During the car chase just prior to appellant's arrest, appellant threw Moore's wallet and two firearms from the car, all of which tie him to the murder. A videotape from the storage facility shows appellant renting the storage unit that housed the stolen electronic equipment, which had appellant's and Parker's fingerprints on them. Based upon the record before us, we agree with the State that there is no reasonable possibility that the erroneous admission of Detective Kelley's testimony contributed to the verdict. See State v. DiGuilio, 491 So.2d 1129, 1135 (Fla.1986).

Right to Remain Silent
In claim five, appellant argues that the prosecutor improperly solicited comment on his right to remain silent by asking his wife, Joanne Rimmer, about her conversations with appellant as to his involvement in the double homicide. Mrs. Rimmer had testified for the defense that appellant had planned on going fishing on the day of the homicides and that he did not return home until 3:30 p.m. She further testified that she, not appellant, was driving the Ford Probe that day. On cross-examination, the State asked Mrs. Rimmer if she had ever asked appellant about the crimes charged. The defense objected on the ground that the State was attempting to elicit testimony concerning appellant's silence by way of his failure to deny involvement in the murders. The State rephrased the question by asking Mrs. Rimmer if she ever asked her husband about the double homicides in this case. She answered no.
Commenting on the defendant's exercise of his right to remain silent is serious error. See State v. Kinchen, 490 So.2d 21, 22 (Fla.1985). The test to be applied in such instances is whether the statement is fairly susceptible of being interpreted by the jury as a comment on the defendant's failure to testify. See id.; see *323 also Jackson v. State, 522 So.2d 802 (Fla. 1988); DiGuilio, 491 So.2d at 1136.
Here the State's question comes very close to infringing on appellant's right to remain silent. However, Mrs. Rimmer testified that she did not ask appellant about the double homicides. Thus, the question coupled with the answer was not fairly susceptible of being interpreted by the jury as a comment on the defendant's failure to testify. Accordingly, we find this claim to be without merit.[14]

Prosecutorial Comments During Guilt and Penalty Phases
In claims six and eight on appeal, appellant contends that the prosecutor made several improper comments during the course of the guilt and penalty phases of the trial. We find the claims to be either without merit or procedurally barred because the comments were not objected to at trial and do not constitute fundamental error.

A. Guilt/Innocence Phase Comments
The comments during the guilt/innocence phase include: (1) extraneous comments in the presence of the jury concerning the trial court's evidentiary rulings; (2) remarks during opening statement that the prosecutor would ask the jury at the close of the evidence to "do the right thing" and "return a guilty verdict"; (3) questions intended to elicit responses concerning appellant's silence; (4) references during closing that the shootings were done execution style;[15] (5) derogatory remarks concerning defense counsel's arguments and closing remarks; (6) reference to tactical maneuvers during military service; (7) telling the jury to "do the right thing"; and (8) comments expressing the prosecutor's personal opinion about the evidence and whether a reasonable doubt exists. Appellant argues that the comments, when considered individually or together, warrant reversal. We disagree.
We initially note that appellant did not object to the majority of the comments he challenges on appeal. In fact, the only comments that appellant objected to were the ones pertaining to tactical maneuvers in the military and the State's question to Mrs. Rimmer as to whether she asked appellant about the double homicides. In order to preserve a claim of prosecutorial misconduct for review, the defense must make a specific contemporaneous objection to the comment and move for a mistrial. See San Martin v. State, 717 So.2d 462, 467 (Fla.1998); Urbin v. State, 714 So.2d 411 (Fla.1998); Chandler v. State, 702 So.2d 186, 191 (Fla.1997); Allen v. State, 662 So.2d 323, 328 (Fla. 1995); but see Holton v. State, 573 So.2d 284, 288 (Fla.1990) (holding that motion for mistrial not necessary where objection is overruled). Appellant failed to do so in this case. As a result, his challenges to the unobjected-to comments are procedurally barred unless he can show that the alleged comments constitute fundamental error. See Urbin, 714 So.2d at 418 n. 8. Fundamental error is defined as error that "reaches down into the validity of the trial itself to the extent that a verdict of guilty could not have been obtained without the assistance of the alleged error." Kilgore v. State, 688 So.2d 895, 898 (Fla.1996). While we find some of the comments in this case to be inappropriate, they do not *324 appear to rise to the level of fundamental error, either individually or collectively.[16]
For example, appellant argues that the prosecutor improperly commented during opening statements that at the conclusion of the evidence he would ask the jury to "do the right thing" and return a verdict of guilty on all counts of the indictment. The prosecutor repeated this remark during closing arguments when he asked the jury to "do the right thing" and convict appellant.[17] However, "do the right thing" comments, while improper, are not so erroneous as long as they are coupled with references to the evidence in the record. See United States v. Barnett, 159 F.3d 637 (D.C.Cir.1998) (unpublished opinion) ("[D]o the right thing" is not clearly erroneous when, as here, the Government couples its argument that the jury should "do the right thing" with specific references to the "evidence in the record."). In this case, the record reveals that both comments were made in reference to the testimony and evidence in the trial. Thus we conclude that such comments do not constitute fundamental error.
Similarly, we reach the same conclusion with regard to the prosecutor's characterization of the shootings as executions.[18] While use of the terms executed or executing during closing argument may sometimes be improper, see Brooks v. State, 762 So.2d 879 (Fla.2000); Urbin v. State, 714 So.2d 411 (Fla.1998), we do not find that the prosecutor's characterizations of the killings jeopardized the validity of the trial or the jury's verdict in this case.
As to the comments which were preserved for review, we find no error. The prosecutor's comment on an adverse ruling by the court was an isolated remark following the trial court's decision to excise references to appellant in codefendant Parker's confession to the police.[19] Following the comment, defense counsel objected, which the trial court sustained, instructing the jury to disregard the comment. Later in the trial, the court admonished counsel not to make any extraneous comments concerning the court's evidentiary rulings. Thus, this claim is without merit.
Appellant's challenge to the prosecutor's reference to his military service and tactical maneuvers while in the military as an improper attempt to personalize himself in the eyes of the jurors is equally without merit. The prosecutor stated during closing argument:
[Prosecutor]: ... I submit to you Parker's role was that of a look-out. That's why he did park in the front, that's why he initially came in the front door of the business. You know, we have some folks that were in the military and I'm sure you can, you can recall during tactical exercises around

*325 [Defense counsel]: Objection, Golden Rule. Sorry, Pete. Objection.
THE COURT: That will be overruled. Not asking the jury to be placed in the shoes of the party. Overruled.
[Prosecutor]: For those of you all that were never in the military, okay, there is a tactical movement for ground troops called a Pinster [sic] movement, a flanking exercise such as portions here, this side, here, this side clears out the entranceway and comes in and you close in here.
The prosecutor then proceeded to explain that is why Parker entered through the front and exited to the bay area; he is the one who advised appellant that Kimberly Davis Burke was sitting in the waiting area. Indeed, shortly after Parker exited the waiting room, appellant entered and told Davis that her boyfriend was looking for her. Thus, the prosecutor's comment was merely an attempt to illustrate that Parker was the look-out and that he informed the appellant that another person was in the waiting room of the store. We do not believe that the prosecutor was attempting to use the reference to the military as an attempt to personalize himself in the eyes of the jurors or to invoke the juror's civic duty. Cf. Ruiz v. State, 743 So.2d 1, 6-7 (Fla.1999) (prosecutor equated jury's duty to impose death with her father's duty to fight in Desert Storm).

B. Penalty Phase Comments
Appellant argues that the prosecutor made several improper comments during the penalty phase of the trial. These comments include: (1) describing the shootings as "vicious and brutal executions"; (2) describing the mental health expert's opinion as "legal mumbo-jumbo"; (3) asserting that the prison system is filled with individuals like appellant who suffer from antisocial personality disorders; (4) telling the jury to do its job and return the "morally" correct death sentence; (5) reciting the victim-impact evidence, followed by a statement advising the jury that while Florida no longer paroles inmates, it does release prisoners through a conditional release program; and (6) during the Spencer hearing, describing the appellant as a "worthless piece of fecal matter ... whose death should come prior to natural causes."
While some of these comments may have been improper, the State correctly notes appellant failed to object to any of them. Because we find that none of the alleged improper comments rise to the level of fundamental error, individually or collectively, these claims are procedurally barred.

Admission of Appellant's Criminal History
In claim seven, appellant argues that the trial court erred in allowing the prosecutor to cross-examine a defense expert, Dr. Martha Jacobson, a psychologist, about appellant's criminal history. Dr. Jacobson told the court that although appellant provided her with this information during the evaluation, she did not rely on it in a "significant or relevant" part. The trial court, however, ruled that the State could cross-examine the doctor because she "used" appellant's criminal history in formulating her opinion. Appellant contends that this ruling was contrary to the testimony. We disagree.
During the penalty phase of the trial, the defense moved to exclude evidence of appellant's criminal history. The State argued that the defense's mental health expert, Dr. Jacobson, had received this information during her evaluation of appellant and had relied on it in formulating her *326 expert opinion.[20] Before ruling on the matter, the Court permitted the State to voir dire the expert to determine whether and to what extent the expert relied on appellant's criminal history in formulating her opinion. Without being specific, the State asked Dr. Jacobson whether she obtained any information from appellant during the clinical interview and whether she utilized that information in formulating her opinion. Dr. Jacobson answered in the affirmative. On cross-examination, defense counsel specifically asked Dr. Jacobson whether appellant's criminal history played "a significant or relevant part" in her evaluation as to appellant's mental condition both at trial and at the time of the offense. Dr. Jacobson responded that it did not. On direct, the State asked the expert, "So that information that the defendant told you about, his prior prison sentences and prior criminal history was not utilized by you in any way, shape or form in formulating your opinions in this case?" Dr. Jacobson responded, "Mr. Magrino [prosecutor] you need to be more specific as to what opinion. It did not affect my opinion as to the presence of mental illness." The trial court found that Dr. Jacobson had learned about appellant's criminal history during her evaluation of him and had used that information in formulating her opinion. Accordingly, the court denied the defense's motion in limine.
Dr. Jacobson subsequently testified that appellant suffers from a schizophrenic disorder, which includes schizophrenic symptoms, mood disorder symptoms, some mania and perhaps some depression. On cross-examination, the State asked Dr. Jacobson about appellant's criminal history. She responded that appellant has eight prior felony convictions. The State then asked whether appellant had relied on a mental disease or mental disorder as a defense in any of the eight prior offenses. Dr. Jacobson testified that she did not know.
Based on the record before us, the trial court did not err in permitting the State to inquire about appellant's prior criminal history. The State may cross-examine a defense expert on matters on which the expert relied in formulating her opinion. See § 90.705, Fla. Stat. (2000) (providing that on cross-examination, the expert "shall be required to specify the facts or data"); Davis v. State, 698 So.2d 1182, 1191 (Fla.1997) (permitting state to cross-examine defense expert on matters contained within a predisposition report that the expert had relied upon in formulating his opinion); Jones v. State, 612 So.2d 1370, 1374 (Fla.1992) (holding that defendant's juvenile, psychiatric, and psychological history was admissible during cross-examination of the defense's expert where *327 the expert had relied on such information in diagnosing the defendant as having a borderline personality disorder); Muehle-man v. State, 503 So.2d 310 (Fla.1987) (holding that inquiry about defendant's juvenile social history report which detailed his juvenile criminal record was permissible since expert relied on report in formulating opinion).
Here, the defense expert did not testify, as appellant contends, that she had not relied on appellant's prior criminal history in formulating her opinion. Rather, she testified during her deposition and in court that she had, in fact, utilized it in formulating her opinion. She merely emphasized that it did not play a "significant or relevant part" in formulating an opinion and that it did not affect her opinion. From the questions asked by counsel for the defense and the State, it appears that the expert did rely on appellant's criminal history, just not in any significant degree. Thus, it was proper for the State to inquire as to whether and to what extent the expert relied on appellant's prior criminal history. It should be noted that during Dr. Jacobson's testimony, the jury was not told what appellant's prior offenses were for or whether he had served any prison time for those offenses. Rather, the State's purpose in asking about the prior offenses was to show that appellant had not relied on a mental illness defense in any of the prior cases. Accordingly, we find no error with regard to this claim.

Heinous, Atrocious and Cruel
In claim nine, appellant argues that the evidence in this case fails to support the finding that the murders were heinous, atrocious, or cruel (HAC). Appellant contends that the evidence indicates that both victims died quickly by a gunshot wound to the head. He argues, therefore, that absent additional evidence that he acted to unnecessarily torture the victims or inflict a high degree of pain and suffering, the killings in this case are not heinous, atrocious, or cruel. We agree with appellant that the evidence in this case does not support this aggravating factor.
In State v. Dixon, 283 So.2d 1 (Fla.1973), we stated:
It is our interpretation that heinous means extremely wicked or shockingly evil; that atrocious means outrageously wicked and vile; and, that cruel means designed to inflict a high degree of pain with utter indifference to, or even enjoyment of, the suffering of others. What is intended to be included are those capital crimes where the actual commission of the capital felony was accompanied by such additional acts as to set the crime apart from the norm of capital felonies the conscienceless or pitiless crime which is unnecessarily torturous to the victim.
Id. at 9 (emphasis added). Unlike the cold, calculated, and premeditated aggravating factor, "the HAC aggravator focuses on the means and manner in which death is inflicted and the immediate circumstances surrounding the death." Brown v. State, 721 So.2d 274 (Fla.1998) (citing Stano v. State, 460 So.2d 890, 893 (Fla.1984)). Thus, we have consistently held that instantaneous or near instantaneous deaths by gunshot, which are unaccompanied by any additional acts by the defendant to mentally or physically torture the victims, are not heinous, atrocious, or cruel. See Ferrell v. State, 686 So.2d 1324, 1330 (Fla.1996) ("Execution-style killings are not generally HAC unless the state has presented other evidence to show some physical or mental torture of the victim."); Hartley v. State, 686 So.2d 1316 (Fla.1996) (same); Donaldson v. State, 722 So.2d 177 (Fla.1998). With regard to shooting deaths in particular, this Court has stated that "murder by shooting, when *328 it is ordinary in that it is not set apart from the norm of premeditated murders, is as a matter of law not heinous, atrocious, or cruel." Lewis v. State, 398 So.2d 432, 438 (Fla.1981); see also Kearse v. State, 662 So.2d 677, 686 (Fla.1995).
The record here does not reveal any actions by appellant to torture the victims or subject them to pain and prolonged suffering. As testified to by the surviving victims, appellant told the victims to lie face down on the floor and bound their hands behind their backs with duct tape. He did not beat or torture the victims. When finished loading the stereo equipment into the car, he asked victim Knight if he remembered him and then fired a single shot into the heads of both Knight and Krause. The record indicates that Knight died instantly and Krause immediately lost consciousness, later dying at the hospital. The fact that appellant forced the victims to lie on the floor with their hands bound while he robbed the store is insufficient to assume that Knight and Krause knew they would be killed or that they lay there in fear of their impending deaths. See Ferrell, 686 So.2d at 1330 ("Speculation that the victim may have realized that the defendants intended more than a robbery when forcing the victim to drive to the field is insufficient to support this aggravating factor."); Menendez v. State, 368 So.2d 1278, 1282 (Fla.1979) (no HAC despite fact that victim storekeeper may have had hands in submissive position at time of killing).[21] While Knight and Krause no doubt experienced fear during this criminal episode, it was not the type of fear, pain, and prolonged suffering that this Court has found to be sufficient to support this aggravating circumstance.[22]
*329 We also reject the State's argument that even if the evidence was insufficient to support HAC as to the first victim, it was still sufficient to support HAC as to the second victim. First, this Court has stated, "[t]he factor of heinous, atrocious or cruel is proper only in torturous murders those that evince extreme and outrageous depravity as exemplified either by the desire to inflict a high degree of pain or utter indifference to or enjoyment of the suffering of another." Shere v. State, 579 So.2d 86, 95 (Fla.1991) (quoting Cheshire v. State, 568 So.2d 908, 912 (Fla.1990) (citing State v. Dixon, 283 So.2d 1 (Fla. 1973)) (emphasis added)). The record in this case, however, does not evince that the defendant acted with extreme and outrageous depravity or that he inflicted a high degree of physical or mental pain.
The facts of this case establish that victim Krause was shot and rendered unconscious very shortly after Knight was shot. Specifically, after Knight was shot, witness Moore jumped up and then was told by the defendant to lie back down. Without any apparent delay or hesitation, the defendant walked directly over to Krause and shot him in the back of the head. According to the opinion of the medical examiner, Krause was rendered immediately unconscious. Therefore, based on the record before us, Krause was killed within a very short time (perhaps only seconds) after Knight and, therefore, would have experienced only a very short period of mental anguish, if any at all.[23] All of the cases wherein we have approved a finding of HAC, however, evince longer and significantly more protracted suffering, as well as additional cruel acts not present (or even analogous to those) in the instant case.[24]
Therefore, for the reasons stated above, we find that the trial court erred in finding the HAC aggravating circumstance with respect to both victims. However, given the five remaining aggravating factors to which the trial court gave great weight balanced against minimal mitigation, we find this error harmless beyond a reasonable doubt. The trial court found five other aggravating factors, to several of which it attributed great weight. However, the trial court gave the HAC aggravator only moderate weight in its determination. Thus, in light of the *330 other aggravating and the mitigating circumstances in this case, we cannot say that the finding of this factor in any way contributed to appellant's sentence of death. See Maharaj v. State, 597 So.2d 786, 791-92 (Fla.1992).

Victim Impact Evidence
Finally, in claim ten, appellant argues that the instruction given by the judge on victim impact evidence does not provide the jury with clear instructions on how it should consider such evidence. Accordingly, he contends that the instruction denied him fundamental fairness in that it allowed the death penalty to be inflicted in an arbitrary and capricious manner. We find that this claim is both procedurally barred and without merit.
As the State correctly notes, appellant did not raise this specific argument to the trial court below. During the charge conference, defense counsel objected to the introduction of several statements intended to be offered by two of the State's witnesses on grounds that the statements were inflammatory and prejudicial. Counsel for Rimmer specifically stated that he had no objection to "victim impact as per the statute." Although defense counsel offered alternative jury instructions on victim impact, the record does not contain a copy of such instructions. The trial court overruled defense counsel's objections and agreed to use the instructions prepared by the State. After the trial court read the instructions to the jury, defense counsel did not object to the victim impact jury instruction. Because appellant did not object to this instruction as given and because appellant raises on appeal an argument that is different than the one argued to the trial court, appellant's claim is not preserved for appellate review. See Tillman v. State, 471 So.2d 32, 35 (Fla.1985) ("In order to be preserved for further review by a higher court, an issue must be presented to the lower court and the specific legal argument or ground to be argued on appeal or review must be part of that presentation if it is to be considered preserved.").
Even if appellant's claim were preserved, we would find that it is without merit. Section 921.141(7), Florida Statutes (1997), permits the State to introduce victim impact evidence once the prosecution has provided evidence as to the existence of one or more aggravating factors. However, the statute limits the evidence to "the victim's uniqueness as an individual human being and the resultant loss to the community's members by the victim's death."[25] In Kearse v. State, 770 So.2d 1119 (Fla.2000), we approved the following jury instruction on victim impact evidence:
Now you have heard evidence that concerns the uniqueness of Danny Parrish as an individual human being and the resultant loss to the community's members by the victim's death. Family members are unique to each other by reason of the relationship and role each has in the family. A loss to the family is a loss to both the community of the family and to the larger community outside the family. While such evidence is *331 not to be considered as establishing either an aggravating or mitigating circumstance, you may still consider it as evidence in the case.
Id. at 1132. In so holding, we rejected the appellant's claim that this instruction failed to give the jury adequate guidance in how to consider the evidence and also gave undue influence to the victim impact evidence by calling it to the jury's attention. See id. Rather, we concluded that this instruction "mirrors this Court's explanation of the boundaries of victim impact evidence and the language in the victim impact evidence statute." Id. (footnote omitted).
Appellant raises the same argument in the instant case, namely that the instruction given by the trial court fails to adequately instruct the jury how to factor the victim impact evidence into their deliberations. The trial court instructed the jury as follows:
You have heard evidence relating to the impact of the victims death in this case. This evidence should not be considered by you as evidence of an aggravating circumstance or rebuttal of mitigating circumstances. This evidence may be considered to demonstrate the victims uniqueness as an individual human being and the resultant loss to the community's members by the victims death.
This instruction mirrors the language of the statute, see § 921.141(7) ("Such evidence shall be designed to demonstrate the victim's uniqueness as an individual human being and the resultant loss to the community's members by the victim's death."), and complies with the parameters this Court set in approving victim impact evidence. See Bonifay v. State, 680 So.2d 413, 419-20 (Fla.1996) ("Clearly, the boundaries of relevance under the statute include evidence concerning the impact to family members. Family members are unique to each other by reason of the relationship and the role each has in the family. A loss to the family is a loss to both the community of the family and to the larger community outside the family."); Windom v. State, 656 So.2d 432, 438 (Fla. 1995) ("Victim impact evidence must be limited to that which is relevant as specified in section 921.141(7)."). Accordingly, we find no error.

Proportionality
Although appellant does not argue the proportionality of the death sentence in this case, this Court must nevertheless conduct a proportionality review. See § 921.141, Fla. Stat. (2000). In conducting its proportionality review, this Court must compare the totality of the circumstances in a particular case with other capital cases to determine whether death is warranted in the instant case. See Bates v. State, 750 So.2d 6 (Fla.1999); Urbin, 714 So.2d at 416 (quoting Tillman v. State, 591 So.2d 167 (Fla.1991)).
Here, the trial court found six aggravating factors: (1) the murders were committed by a person convicted of a felony and under a sentence of imprisonment; (2) the defendant was previously convicted of another capital felony and a felony involving use or threat of violence to the person; (3) the murders were committed while the defendant was engaged in a robbery and kidnaping; (4) the murders were committed for the purpose of avoiding or preventing lawful arrest; (5) the murder was especially heinous, atrocious, or cruel (HAC); and (6) the murders were cold, calculated, and premeditated (CCP). The trial court found no statutory mitigators, but found several nonstatutory mitigators: (1) Rimmer's family background (very little weight); (2) Rimmer was an excellent employee (some weight); (3) Rimmer has helped and ministered to *332 others (minimal weight); (4) Rimmer is a kind, loving father (not much weight); and (5) Rimmer suffers from a schizoaffective disorder (little weight). As to appellant's mental illness, Dr. Jacobson testified only that appellant suffers from a schizoaffective disorder. She could not say whether this condition supported the statutory mental mitigators. Likewise, Dr. Walczak, who testified at the Spencer hearing, offered no opinion as to whether appellant suffered from an extreme or emotional disturbance at the time he committed the offenses.
Although we conclude that the trial court improperly found HAC as an aggravating factor as to the first victim, we have concluded that this error was harmless since there are five remaining aggravating factors to which the trial court gave great weight balanced against minimal mitigation. When we compare the totality of the circumstances in this case with other capital cases in which we upheld the sentence of death, we cannot say that appellant's sentence is disproportionate. See Alston v. State, 723 So.2d 148 (Fla.1998) (upholding sentence of death where defendant and another man abducted the victim and shot him to death; finding five aggravating factorsprior violent felony, murder committed during a robbery and kidnaping, avoiding arrest, HAC, and CCP and several mitigating factors, including deprived and violent childhood, cooperation with police, low intelligence and mental age, bipolar disorder, and ability to get along with other people); Jennings v. State, 718 So.2d 144 (Fla.1998) (upholding death sentence where defendant killed three Cracker Barrel employees during a robbery by slitting their throats; trial court found three aggravating factors murder committed during the course of a robbery, murder committed to avoid arrest and CCPand several mitigating factors including no significant history of criminal behavior, deprived childhood, accomplice received a life sentence, cooperation with police, good employment history, loving relationship with mother, positive personality traits, capacity to care for and be loved by children, exemplary courtroom behavior). We further note that the fact that appellant's co-felon received life imprisonment does not render appellant's sentence disproportionate because the facts in this case clearly reveal that appellant is the more culpable defendant. See Foster v. State, 778 So.2d 906, 922 (Fla. 2000); Hannon v. State, 638 So.2d 39, 44 (Fla.1994). Accordingly, we affirm appellant's sentences of death.

CONCLUSION
Based on the foregoing, we affirm appellant's convictions and sentences of death.
It is so ordered.
HARDING, J., concurs.
LEWIS, J., concurs in result only with an opinion, in which QUINCE, J., concurs.
WELLS, J., concurs in part and dissents in part with an opinion.
PARIENTE, J., concurs in part and dissents in part with an opinion, in which ANSTEAD, C.J., and SHAW, J., concur.
LEWIS, J., concurring in result only.
I do not agree with the majority's conclusion today that the trial court erred in finding that the appellant's killing of the second victim, Krause, was heinous, atrocious, or cruel ("HAC"). Under Florida capital sentencing jurisprudence, it is clear that under certain circumstances, the HAC aggravator may be applicable even when the victim's death is effectuated by a single gunshot. In my view, there was sufficient evidence before the trial court to support its determination that HAC is applicable *333 here at least in connection with the killing of the appellant's second victim, and I must, therefore, concur in result only. The majority decision today destabilizes Florida law in this area because there is no significant difference between the facts here and those presented in Farina v. State, 801 So.2d 44 (Fla.2001), as reported in Farina v. State, 680 So.2d 392 (Fla. 1996).
While the appellant is correct that instantaneous or near instantaneous deaths inflicted by gunshot do not generally support a trial court's finding of HAC, this principle is only available when the acts are unaccompanied by other physically or mentally torturous acts by the defendant. Indeed, "[f]ear and emotional strain may be considered as contributing to the heinous nature of the murder, even where the victim's death was almost instantaneous." Farina, 801 So.2d at 53 (quoting Preston v. State, 607 So.2d 404 (Fla.1992)). Additionally, application of the HAC aggravator is to be resolved based upon the victim's perceptions of the circumstances, not those of the perpetrator. See Farina, 801 So.2d at 53; Hitchcock v. State, 578 So.2d 685, 692 (Fla.1990).
While I agree with the majority's conclusion that the appellant's murder of the first victim, Knight, does not qualify as especially heinous, atrocious, or cruel, I cannot agree as to the second. The first victim simply had no real warning or awareness of his impending death and his execution may indeed be characterized as a "simple" gunshot death, if that word may be utilized to characterize any death. See, e.g., Ferrell v. State, 686 So.2d 1324 (Fla. 1996); Hartley v. State, 686 So.2d 1316 (Fla.1996). However, because the appellant's execution of the first victim, Knight, occurred before his shooting of Krause and in the immediate area of Krause, I conclude that sufficient evidence exists in the record for the trial court to conclude that Krause was subject to "`real and excruciating' mental anguish and ... acute awareness of [his] impending death" before he was fatally shot. Farina, 801 So.2d at 52; see also Swafford v. State, 533 So.2d 270, 277 (Fla.1988) (holding that "the victim's mental state may be evaluated ... in accordance with a common-sense inference from the circumstances").
This case is strikingly similar to the circumstances presented in Farina. In Farina, the defendants "rounded up" the store employees at gunpoint, tied the employees' hands, and forced them into a walk-in freezer. See Farina, 680 So.2d at 394. Shortly after the employees were gathered in the freezer, the defendants killed certain of the hostage employees in a successive fashion. See id. Just as was the case in Farina, the victim here had his hands bound along with another employee and customers and he witnessed the defendant execute a coworker. This Court concluded that the trial court had properly found HAC in Farina. I suggest the same application of the aggravator is appropriate with regard to Krause's killing in the instant case. The trial court's consideration that Krause was terrified and aware of his impending violent death as the appellant approached him is certainly supported by evidence contained in the record, just as we concluded in Farina with regard to the shooting of the victim, Van Ness, who also met her death by a single shot to the head after a co-employee had been shot.
Based upon the foregoing, I would affirm the trial court's finding the HAC aggravator applied with regard to the appellant's murder of Bradley Krause. To do otherwise renders the majority decision directly contrary to the authority in Farina on significantly similar facts.
QUINCE, J., concurs.
*334 WELLS, J., concurring in part and dissenting in part.
I concur in affirming the conviction and in result only as to the sentence of death. I dissent as to the striking of the heinous, atrocious, or cruel (HAC) aggravator.
I do not agree with the majority that the trial court erred in respect to the finding of HAC, I believe the majority's analysis places improper focus on the fact that the death was by gunshot. Whereas the trial court could and did properly find based on the evidence, the trial court heard live in the courtroom:
In this case it is the fear, emotional strain and terror of Aaron Knight and Bradley Krause, Jr. during the events leading up to their murders that allow these quick deaths to be considered heinous, atrocious, or cruel.
The trial judge stated that his determination was based upon the testimony of the survivors, Kimberly Davis, Joe Louis Moore, and Louis Rosario, who likewise suffered terror for the fifteen to thirty minutes each had to lay face to the floor with duct tape behind their backs, but did not experience the aggravated terror which victim Knight obviously suffered when told by Rimmer, "You know me."
The trial judge's finding is in accord with what this Court held in Pooler v. State, 704 So.2d 1375, 1378 (Fla.1997):
However, we have also held that the fear, emotional strain and terror of the victim during the events leading up to the murder may be considered in determining whether this aggravator is satisfied, even where the victim's death was almost instantaneous. James v. State, 695 So.2d 1229 (Fla.1997); Preston v. State, 607 So.2d 404, 409-10 (Fla.1992); Rivera v. State, 561 So.2d 536, 540 (Fla. 1990); Adams v. State, 412 So.2d 850, 857 (Fla.1982). Moreover, the victim's mental state may be evaluated for purposes of this determination in accordance with a common-sense inference from the circumstances. Swafford v. State, 533 So.2d 270, 277 (Fla.1988).
The common sense inference from these facts supports the trial judge's finding.
I believe the majority seriously errs by its rejection of the plain cruelty of the acts leading to the murder of the two victims.
PARIENTE, J., concurring in part and dissenting in part.
I concur in the majority opinion in all respects, including the analysis regarding the striking of the HAC aggravator, but dissent as to the affirmance of the conviction because I disagree that the admission of Detective Kelley's testimony on rebuttal constituted harmless error. I write to explain my reasons for concluding that the erroneous admission of Detective Kelley's testimony on rebuttal cannot meet the stringent harmless error test of State v. DiGuilio, 491 So.2d 1129, 1135 (Fla.1986).
The majority concludes that the admission of Detective Kelley's testimony on rebuttal about his ability to see without eyeglasses was error and improperly admitted to rebut the defense's expert testimony that Rimmer wore eyeglasses and that without them he would be considered legally blind. See majority op. at 321. I agree that not only was this testimony irrelevant, but placing this testimony before the jury through the police officer exacerbated the effect of the error.
I do not, however, agree with the majority opinion that this testimony was harmless beyond a reasonable doubt. Rather, under DiGuilio, the burden rests "on the state, as the beneficiary of the error, to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict or, alternatively stated, that there is no reasonable possibility that the *335 error contributed to the conviction." DiGuilio, 491 So.2d at 1135. Our obligation is to look at the improper evidence to determine if it possibly might have influenced the jury verdict. See id.
As we have often stated, a harmless error analysis is not a sufficiency of the evidence analysis. "[H]armless error analysis must not become a device whereby the appellate court substitutes itself for the jury, examines the permissible evidence, excludes the impermissible evidence, and determines that the evidence of guilt is sufficient or even overwhelming based on the permissible evidence." Id. at 1136. As we stated in DiGuilio:
Overwhelming evidence of guilt does not negate the fact that an error that constituted a substantial part of the prosecution's case may have played a substantial part in the jury's deliberation and thus contributed to the actual verdict reached, for the jury may have reached its verdict because of the error without considering other reasons untainted by error that would have supported the same result.
Id. Finally, although the Court observed that no sentence should be reversed absent harmful error, the Court made clear that "[i]f the appellate court cannot say beyond a reasonable doubt that the error did not affect the verdict, then the error is by definition harmful." Id. at 1139. We recently reaffirmed these important principles regarding a harmless error analysis in Goodwin v. State, 751 So.2d 537 (Fla.1999).
In this case, the focus of the defense was one of misidentification and specifically that Rimmer required eyeglasses to see and to operate a motor vehicle. In addition to calling Rimmer's optician, from whom he received prescription eyeglasses in both February and May, 1998, Rimmer also called his optometrist, Dr. Brucejolly, who performed an eye examination on Rimmer that determined that Rimmer was nearsighted to such a degree that when not wearing corrective lenses, Rimmer would be considered legally blind. In fact, Dr. Brucejolly testified that Rimmer could not operate a motor vehicle in traffic without his corrective lenses without getting into an accident.
Rather than calling its own expert to rebut the defense's theory that an individual with Rimmer's eyesight could indeed shoot a gun and operate a motor vehicle without wearing corrective lenses, the State instead improperly called Detective Kelley who testified about his own eyesight and his own ability to perform without eyeglasses. For example, the State asked the following questions:
Q. Officer Kelley, ... have you ever driven your automobile without your glasses on?
A. Yes.
Q. Get in a car wreck?
A. No.
The intent of this testimony was to rebut evidence by the defense that Rimmer could not operate a motor vehicle in traffic without getting into an accident.
Furthermore, as we have explained, "error in admitting improper testimony may be exacerbated where the testimony comes from a police officer." Martinez v. State, 761 So.2d 1074, 1080 (Fla.2000); see Rodriguez v. State, 609 So.2d 493, 500 (Fla.1992). "When a police officer, who is generally regarded by the jury as disinterested and objective and therefore highly credible, is the corroborating witness, the danger of improperly influencing the jury becomes particularly grave." Martinez, 761 So.2d at 1080.
In addition to the testimony itself, prejudice also occurred when, in demonstrating Detective Kelley's ability to see, the prosecutor asked Detective Kelley to read or *336 describe certain items in the courtroom after asking Officer Kelley to remove his glasses and stand. During this demonstration, the prosecutor lay down on the floor and then asked Detective Kelley to point his forefinger at him with his thumb pointed to the ceiling (as if he was holding a gun), and aim at the prosecutor's head. The following colloquy then took place over defense counsel's objection:
Q. [By prosecutor]: With the permission of the court, Officer Kelley, if you could stand up, please?
A. Yes, sir.
Q. Can, where your standing, okay, can you see me while I'm laying down on the floor of the courtroom here?
. . .
A. Yes, I can.
Q. Will you approximate for the members of the jury and the record how many feet you're from me?
A. Approximately five or six feet.
Q. Officer Kelley, would you take your right arm and put it parallel to the floor of the courtroom.
A. (Indicating.)
Q. Point it towards the direction of the rear of the courtroom.
A. (Indicating.) ...
Q. Would you put your thumb, point it towards the ceiling of the courtroom and take your forefinger so it is parallel to the floor of the courtroom; and if you would, could you point at my head please?
A. (Indicating.) ...
This demonstration was intended to prove to the jury that Rimmer could have committed these murders with or without his glasses. The only problem is that the demonstration was based on what Officer Kelley could see, not what Rimmer could see.
In a different context, we have cautioned that "artificial recreation of an event may unduly accentuate certain phases of the happening, and because of the forceful impression made upon the minds of the jurors by this kind of evidence, it should be received with caution." Cave v. State, 660 So.2d 705, 708 (Fla.1995). Because the reenactment of the crime in this case occurred in rebuttal and near the end of the presentation of the evidence, it certainly would have left a forceful and graphic impression on the jurors' minds. Accordingly, in my opinion, the State has not satisfied its burden of demonstrating harmless error beyond a reasonable doubt in the admission of Detective Kelley's testimony and the accompanying reenactment.
Further, although the majority relies in part on the strength of the eyewitness identifications in finding the admission of Detective Kelley's testimony to be harmless error, I write to express my concerns with relying too heavily on the eyewitness identifications in this case. Justice Brennan, in United States v. Wade, 388 U.S. 218, 228, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), addressed the very real danger of a mistaken identification arising from eyewitness testimony:
The vagaries of eyewitness identification are well-known; the annals of criminal law are rife with instances of mistaken identification.... A major factor contributing to the high incidence of miscarriage of justice from mistaken identification has been the degree of suggestion inherent in the manner in which the prosecution presents the suspect to witnesses for pretrial identification.
(Footnote omitted.) Concerning the relationship between a suggestive procedure and the risk of misidentification, Justice Brennan several years later observed in Neil v. Biggers, 409 U.S. 188, 198, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972):

*337 It is, first of all, apparent that the primary evil to be avoided is a "very substantial likelihood of irreparable misidentification."... It is the likelihood of misidentification which violates a defendant's right to due process .... Suggestive confrontations are disapproved because they increase the likelihood of misidentification, and unnecessarily suggestive ones are condemned for the further reason that the increased chance of misidentification is gratuitous.
(Citation and footnote omitted.)
Since Neil was decided, additional social science research, as well as actual cases, have taught us much about the fallibility of eyewitness identification and the danger of relying too heavily on eyewitness identification as absolute proof of a defendant's guilt. Reviewing social science research pertaining to eyewitness identification, Clinical Professor of Law Connie Mayer of Albany Law School has written on the subject of the unreliability of and inherent problems with eyewitness identifications. See Connie Mayer, Due Process Challenges To Eyewitness Identification Based On Pretrial Photographic Arrays, 13 Pace L.Rev. 815 (1994).[26] As Professor Mayer explained in general, there is a high risk of misidentification:
[W]hile a great deal of credibility is given to eyewitness identification, empirical studies have shown that eyewitness identification can actually be extremely unreliable. Given the weight afforded eyewitness identification, it is not surprising that studies have shown that approximately fifty percent of those wrongly convicted were convicted based on eyewitness identification evidence. This makes mistaken identity the factor most often responsible for wrongful conviction.

What makes eyewitness identification unreliable? When crime victims attempt to recall faces of strangers they have seen for only a brief period of time, many factors affect their ability to accurately remember what they have seen. Factors that may affect reliability of the identification include: lighting conditions; the duration of the event; violence; the age, sex and race of the perpetrator; the length of time between the event and the identification and the acquisition of post-event information that may distort the memory.
Id. at 819 (emphasis supplied) (footnotes omitted).
In specifically discussing photographic arrays, Professor Mayer explains:
In addition to these factors, special problems exist with respect to the identification *338 of a person from a photographic array. After a crime has been committed, it is often standard police procedure to construct a photographic array to show a witness. One danger inherent in the reliability of an identification from such an array relates to the expectation on the part of the eyewitness that the suspect is, in fact, in the photographic array. The eyewitness, believing the suspect is present in the array, will often identify the person that looks most like the criminal, rather than choosing no one.
The number of photographs in an array and the physical characteristics of the participants are also factors bearing on the reliability of the photographic identification. But in addition, the photograph is merely a two-dimensional depiction of a person. Often a witness cannot discern the height and weight accurately from a photograph.
Id. at 820 (footnotes omitted).
With regard to a subsequent live lineup, the dangers of suggestibility as a result of the prior photographic lineup are substantial:
A subsequent corporeal line-up, which includes a suspect already selected from a photographic array, compounds the problems inherent in the use of photographs by creating what researchers have called a photo-biased line-up. After being shown a photographic array, a witness will often be asked to view a corporeal line-up. The witness often chooses the person who looks most familiar, believing that the person is familiar because of the crime. Studies have demonstrated that viewing a suspect's photograph after a crime but prior to a corporeal line-up dramatically increases the chances of identification of that particular suspect at the subsequent lineup. This finding casts serious doubt on the reliability of pretrial and in-court identifications when a photographic array has first been displayed to the witness.
Id. at 820-21 (emphasis supplied) (footnotes omitted).[27]
Some of the factors affecting the reliability of an eyewitness identification were present in this case. For example, eyewitness Moore was shown a photo array of six photographs and selected Rimmer. However, over two months later, Moore was asked to view a physical lineup. Prior to viewing the physical lineup, the police told Moore that a suspect had been arrested, implying that the suspect was present in the lineup. Furthermore, Rimmer was the only person in the lineup whose photo had been in the photo spread viewed by Moore. I would find this technique to be unnecessarily suggestive because, as discussed above, based on the psychology of eyewitness identification and its well-known unreliability, the identification of Rimmer in the live lineup could have been influenced by Moore's prior viewing of Rimmer's photograph after the crime.
Similarly, as to eyewitness Davis, at the photo lineup, she selected another individual in photograph 6 as her first choice and photograph 3, Rimmer's photograph, as her second choice. At that time, Detective Lewis told Davis that Moore had selected photograph number 3. Davis proceeded to pick out Rimmer from a live lineup two months after the photo lineup. Although Davis is the witness who had the most opportunity to observe the shooter, she is *339 the only person who selected two people from the photographic lineup.
No matter how certain either eyewitness is of the identification of Rimmer as the person he or she saw commit these terrible murders, we cannot overlook the fact that their identifications may be flawed by the subsequent procedures utilized by the police. Although I agree that the identifications were properly admitted, I would not rely on the identifications to find the admission of Detective Kelley's testimony harmless beyond a reasonable doubt.
Certainly, there was an abundance of evidence that linked Rimmer to the crime in that he possessed the stolen goods. However, there was no physical evidence that linked him to the scene. Moreover, a third man involved with the crimes was never found. Although Rimmer was identified by two eyewitnesses, not only were there flaws with the procedures used, but I point out that both eyewitnesses identified the shooter as being five feet, ten inches tall and not wearing glasses, whereas Rimmer is six feet, two inches tall and is legally blind without his glasses. Furthermore, there was a discrepancy about Rimmer's weight.
In conclusion, although Rimmer is not entitled to a perfect trial, he is entitled to a fair trial. The State, as the beneficiary of the error, has not proven beyond a reasonable doubt that the error complained of did not contribute to the verdict of guilt and the ultimate death sentence imposed. In this case, justice demands that Rimmer should be given a new trial in light of the prejudicial nature of Detective Kelley's testimony and the prosecutor's improper reenactment of the crime.
ANSTEAD, C.J., and SHAW, J., concur.
NOTES
[1] The State argued that a third man was also involved but he was never located.
[2] The record reflects that this witness was referred to as Kimberly Davis, Kimberly Davis Burke, and Kimberly Burke.
[3] Dixon was not present at the Audio Logic store at the time of the shooting. When the shooting occurred, he was working at the sister store, located in Davie, Florida.
[4] According to the State's firearm expert, the projectile fragment and shell casings found at the scene of the crime matched this firearm.
[5] At trial, a fingerprint expert testified that approximately twenty-four prints matched appellant's fingerprints and twenty-one prints matched Parker's.
[6] At the hearing held in compliance with Spencer v. State, 615 So.2d 688, 690-91 (Fla. 1993), the defense presented a second expert, Michael Walczak, a neuropsychologist, who agreed with Dr. Jacobson's diagnosis.
[7] Parker's penalty phase proceeding took place after Rimmer's. However, the record does not contain the jury's recommendation or the trial court's sentence as to Parker. According to appellant's brief on appeal, the jury recommended that Parker be sentenced to life imprisonment and the trial court apparently followed that recommendation. See Initial Brief of Appellant at 2.
[8] Specifically, the trial court rejected the statutory mitigator that appellant was under the influence of extreme mental or emotional disturbance at the time of the offense.
[9] Appellant's claims are: (1) the trial court erred in denying a motion to suppress physical evidence where the items seized were not part of the search warrant for defendant's vehicle; (2) the trial court erred in admitting the pretrial and trial identifications of appellant by two witnesses where the procedures employed by the police were unnecessarily suggestive; (3) the trial court erred in excusing two prospective jurors; (4) the trial court erred in allowing Detective Kelley to testify about his ability to see without prescription eyeglasses as rebuttal testimony to evidence that appellant could not function without his glasses; (5) the trial court erred in failing to declare a mistrial when the prosecutor asked the appellant's wife whether she had ever asked her husband about the murders, thereby encroaching upon appellant's right to remain silent; (6) prosecutorial comments during the guilt phase proceedings denied appellant of a fair trail; (7) the trial court erred in allowing the prosecutor to cross-examine the defense's mental health expert about appellant's criminal history where the expert did not rely on the evidence in her evaluation or opinion; (8) improper prosecutorial comments during the penalty phase proceedings denied appellant a fair trial; (9) the evidence is insufficient to support the heinous, atrocious and cruel (HAC) aggravator; and (10) the trial court erred in permitting the jury to consider victim impact evidence.
[10] The Supreme Court in Horton rejected the requirement that the police inadvertently discover evidence in plain view. See 496 U.S. at 137, 110 S.Ct. 2301.
[11] Appellant does not challenge the procedure used by the police for the photo spread, during which Moore selected appellant.
[12] Appellant's attorney did not object to the State's peremptory strike. For this reason alone, it appears that this issue is not adequately preserved as to appellant.
[13] There was no testimony in this case as to whether appellant wears contact lenses.
[14] Appellant's additional ground for reversal, that the comment infringed on the husband-wife privilege, was not preserved for appellate review because he did not object to the State's question on this ground.
[15] Appellant points to several comments during the guilt phase as well as the penalty phase. This opinion addresses the comments from both phases together.
[16] Moreover we find no error with regard to several of the alleged comments. These include: (1) comments concerning defense counsel and his arguments during closing; (2) comments on the witnesses and evidence and the absence of reasonable doubt; and (3) the use of a baseball analogy by asking the jury to think of itself as baseball players and to keep their eyes on the ball (i.e., the facts and evidence in the case) and not be swayed by "sliders" or "outside fast balls."
[17] The State quotes portions of the record where the prosecutor asked the jury to "do the right thing." See Appellee's Answer Brief at 62-64.
[18] Appellant also points out that the prosecutor improperly told the jury that appellant "blew [Aaron Knight's] brains out by shooting him in the back of the head."
[19] The prosecutor stated, "Given the court's ruling, I have no further questions of Detective Lewis at this time."
[20] Outside the presence of the jury, the State quoted from a portion of Dr. Jacobson's deposition testimony, as follows:

[Prosecutor]: Judge, on page 15, starting at Line 23, "When you spoke to Mr. Rimmer, did you ask him about his criminal history? Answer: Yes, I did." Top of page 16. "Question, What did he tell you? Answer, If I can refresh my recollection I can tell you. Question, Sure. Answer, he told me he had some problems in the adolescent, juvenile justice system in terms of skipping school, petit theft and burglary. He was first tried as an adult at 16. Two armed robberies and possibly a possession of firearms. He wasn't quite sure if that was there. He also had eight cases for which he was sentenced to the Appalachian Correctional Institution for a period of four years. He was not specific as to what those charges were. Question, do you have an approximation as to how many felony convictions? Answer, Well, based on what he told me, there would be at least ten if each of those cases was considered a separate conviction. Question, Did Mr. Rimmer tell you how many times he served prison? Answer, I believe twice if I'm not mistaken."
[21] In Henderson v. State, 463 So.2d 196 (Fla. 1985), another case relied upon by the State, the defendant picked up three hitchhikers, bound and gagged them, and shot them in the head. Although this Court emphasized that the three victims in that case "obviously experienced extreme fear and panic while anticipating their fate," there was no evidence in the instant case that the victims believed that appellant was going to do anything other than rob them. In fact, appellant had started to leave before he returned and shot two of the five victims.
[22] We do not agree with Justice Wells' concurring opinion. The fact that the defendant said, "You know me," immediately before shooting and instantaneously killing Knight does not, by itself, provide sufficient evidence of the type and duration of "aggravated terror" which this Court has found to be sufficient to support a finding of HAC beyond a reasonable doubt. For example, in Pooler v. State, 704 So.2d 1375 (Fla.1997), this Court found the HAC aggravator was established where the defendant had threatened to kill the victim two days earlier, forced his way into the victim's apartment, shot the victim's brother in the back, chased the victim into the yard, struck the victim with a gun, dragged the victim to his car as she screamed and begged him not to kill her, and then shot the victim five times. Similarly, the cases relied on by the Pooler court contain evidence substantially more aggravated than the defendant's short statement to Knight made immediately before shooting and instantaneously killing Knight. See James v. State, 695 So.2d 1229 (Fla.1997) (finding HAC where defendant squeezed eight-year-old victim's neck while victim looked at defendant "until her eyes and tongue bulged out" after which defendant had vaginal and anal intercourse with victim before victim died of asphyxiation); Preston v. State, 607 So.2d 404, 406, 409-10 (Fla.1992) (finding HAC where defendant forced the victim to drive to remote location, made her walk at knife point through a dark field, forced her to disrobe, and then inflicted multiple stab wounds and lacerations resulting in her near decapitation); Rivera v. State, 561 So.2d 536, 540 (Fla.1990) (finding HAC where defendant abducted victim, took her to a field where he sexually assaulted her, and then killed victim by asphyxiation while victim screamed and resisted); Adams v. State, 412 So.2d 850 (Fla.1982) (finding HAC where defendant abducted eight-year-old girl, bound her hands so tightly behind her back so that her hands swelled, disrobed victim, and wrapped seven coils of rope around victim's neck before suffocating victim); Swafford v. State, 533 So.2d 270 (Fla.1988) (finding HAC where defendant forcibly abducted and sexually abused victim before shooting victim nine times, mostly at victim's torso and extremities).
[23] Despite the fact that Krause may have been tied up for a total of "15 to 20 minutes" during the entire episode, Ferrell counsels us that it is only the mental anguish experienced by Krause subsequent to the shooting of Knight that should be considered when evaluating whether the HAC aggravator has been established.
[24] See Henyard v. State, 689 So.2d 239 (Fla. 1996) (finding HAC where victims witnessed rapes and shooting of their mother before victims were driven to another location and shot); Douglas v. State, 575 So.2d 165 (Fla. 1991) (finding HAC where defendant "said he felt like blowing our ... brains out," forced the victim to perform various sexual acts at gun point and, during the attempt to comply, fired the rifle into the air, and hit victim so forcefully in the head with the rifle that the stock shattered, before shooting victim in the head); Parker v. State, 476 So.2d 134 (Fla. 1985) (finding HAC where defendants told victim she would be killed so that she could not identify them, victim pleaded during "13-mile death-ride" not to be hurt, victim's bladder was completely voided "consistent with her being in great fear prior to her death," victim had large chunks of her hair torn out by the roots, and was stabbed in the stomach before being shot execution-style); Routly v. State, 440 So.2d 1257 (Fla.1983) (finding HAC where victim was bound during robbery, carried from own house, thrown into trunk of his own car, and driven out of town through back roads in middle of night before being shot).
[25] Section 921.141(7) provides:

VICTIM IMPACT EVIDENCE.Once the prosecution has provided evidence of the existence of one or more aggravating circumstances as described in subsection (5), the prosecution may introduce, and subsequently argue, victim impact evidence. Such evidence shall be designed to demonstrate the victim's uniqueness as an individual human being and the resultant loss to the community's members by the victim's death. Characterizations and opinions about the crime, the defendant, and the appropriate sentence shall not be permitted as a part of victim impact evidence.
[26] In this article, the author reviewed the following articles or studies on the reliability of eyewitness identification: Arye Rattner, Convicted But Innocent, 12 L. & Hum. Behav. 283, 289 (1988); Elizabeth F. Loftus & James M. Doyle, Eyewitness Testimony: Civil & Criminal, 25-26 (1987); Brian L. Cutler et al., The Reliability of Eyewitness Identification, 11 L. & Hum. Behav. 233, 244 (1987); Elizabeth F. Loftus & Edith Green, Warning: Even Memory for Faces Can be Contagious, 4 L. & Hum. Behav. 323, 332-34 (1980); Gary L. Wells et al., Accuracy, Confidence and Juror Perceptions in Eyewitness Identification, 64 J. Applied Psychol. 440, 446 (1979); Elizabeth Loftus, Eyewitness Testimony, 144 (1979); Brian R. Clifford & Ray Bull, The Psychology of Person Identification, 194 (1978); Robert Buckhout et al., Eyewitness Identification: Effects of Suggestion and Bias in Identification of Photographs, 4 Bull. Psychonomic Soc'y 71, 71-72 (1975); Elizabeth Loftus, Restructuring Memory: Incredible Eyewitness, 8 Psychol. Today 116, 118 (1974); Robert Buckhout et al., Determinants of Eyewitness Performance on a Lineup, 4 Bull. Psychonomic Soc'y 191, 192 (1974); Ruth Ellen Galper & Julian Hochberg, Recognition Memory for Photographs of Faces, 84 Am. J. Psychol. 351, 351, 353-54 (1971); Patrick M. Wall, Eyewitness Identification in Criminal Cases, 66-68 (1965).
[27] The United States Supreme Court has recognized that the repeated showing of a particular picture of an individual in a series of arrays reinforces the image of the photograph in the mind of the witness, causing the procedure to be highly suggestive. See Simmons v. United States, 390 U.S. 377, 383, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968).